UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - -

HUNTER DRAGON,                    No.:  3:23-cv-188-RNC

               Plaintiff

        v.

SCA PHARMACEUTICALS, LLC.,

                   Hartford, Connecticut
              Defendant       JULY 16, 2024

- - - - - - - - - - - - - - - -


TELEPHONE CONFERENCE/MOTION HEARING


B E F O R E:


    THE HONORABLE ROBERT N. CHATIGNY, SENIOR U.S.D.J.


A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        FRIEDMAN & HOULDING LLP
        1050 Seven Oaks Lane
        Mamaroneck, NY  10543
        BY:  REBECCA HOULDING, ESQUIRE

    FOR THE DEFENDANT:

        HALLORAN & SAGE LLP
        One Goodwin Square
        225 Asylum Street
        Hartford, CT  06103
        BY:  KEVIN J. GREENE, ESQUIRE


                    Alicia A. Cayode Kyles, RMR
                    Official Court Reporter

```
 1              (The telephonic conference began at 10:01 a.m.)

 2              THE COURT:  Good morning.  This is Judge Chatigny

 3   speaking.  This is a telephone conference in the case of

 4   Dragon v. SCA Pharmaceuticals, LLC.

 5              Would counsel please enter their appearances.

 6              MS. HOULDING:  Good morning, Your Honor.  Rebecca

 7   Houlding for the plaintiff, Hunter Dragon.

 8              THE COURT:  Good morning.

 9              MR. GREENE:  Good morning, Your Honor.  It's

10   Kevin Greene and I represent the defendant, SCA

11   Pharmaceuticals.

12              THE COURT:  Good morning.

13              This is a telephone conference to address the

14   pending motion to compel arbitration and the accompanying

15   motion to dismiss the constructive discharge claims.

16              I've read your briefs and the cases that you cite

17   and during this conference you'll have an opportunity to

18   make whatever presentations you wish.

19              Mr. Greene, you're welcome to proceed.

20              MR. GREENE:  Thank you, Your Honor.

21              As Your Honor noted this is the defendant's

22   motion to compel arbitration as to the plaintiff's amended

23   complaint as well as the motion to dismiss Counts Three

24   and Four for constructive discharge.

25              Your Honor, I would start out by noting that
```

1    there appears to be no dispute that Mr. Dragon was

2    provided with the arbitration agreement, that he had an

3    opportunity to review it, that he signed it, that the

4    language from the arbitration provision was clearly

5    applied to the dispute and claims that are set forth in

6    the amended complaint.

7              The plaintiff's primary argument in that regard

8    appears to be that while there's no contracted employment,

9    but we have cited the series of cases in our district, in

10   particularly the *Paltz* case, which states that if there's

11   an agreement to arbitrate then that's all that matters.

12   The fact that an over or underlying contracted employment

13   doesn't exist or that there was no agreement to alter the

14   plaintiff's employment at-will status doesn't matter.  If

15   the parties agree to arbitrate, then that arbitration

16   agreement should be enforced.

17             THE COURT:  Right.

18             MR. GREENE:  And --

19             THE COURT:  The difficulty I'm having with that

20   part of your argument is that here, the documents on which

21   you rely contain explicit repeated disclaimers of any

22   contractural intent or obligation whatsoever with no

23   exception for arbitration and it appears to me that this

24   readily distinguishes our situation from the one in Paltz

25   for example where you did not have that type of disclaimer

```
 1    with regard to the arbitration agreement.

 2              MR. GREENE:  So, Your Honor, just to address that

 3    point I believe that in Paltz, as well as in the other

 4    cases that we cite, Rowe and Johnson v. Raymours Furniture

 5    that the courts in those cases were focusing on the fact

 6    that if the language of the provision in the employee

 7    handbook notes that there's an agreement to arbitrate that

 8    that's all that matters, that if -- the fact that there

 9    may be other language stating that this is not a

10    contracted employment, if there was a -- doesn't set forth

11    any contractural obligations, doesn't mean that that would

12    invalidate the fact that there was an agreement on the

13    arbitration provision and an acknowledgment specifically

14    by the plaintiff and the defendant, for that matter, that

15    any disputes that they have would be submitted to

16    arbitration.

17              So, I think that the analysis needs to get into

18    kind of the details of what that language is and in this

19    case the agreement clearly sets forth a mutual

20    understanding and agreement to arbitrate and we shouldn't

21    invalidate that simply because there's other language

22    stating that this does not constitute a contracted

23    employment.

24              THE COURT:  Well, I agree that we have to bear in

25    mind that you can have the enforceable agreement to
```

1    arbitrate not withstanding the lack of an employment

2    contract but here, again, in this case, we have explicit

3    language disclaiming any contractural intent or obligation

4    and this disclaimer appears in the same document as the

5    reference to arbitration, indeed, any paragraph preceding

6    referenced arbitration.

7          So why isn't this one of those cases where the

8    courts have said the employer can't have it both ways?

9          MR. GREENE:  Well, I think that the fact that the

10   language regarding the arbitration provision is clear and

11   the plaintiff has acknowledged an agreement to that

12   provision, would be sufficient to find that there was an

13   agreement by the parties to submit the matter to

14   arbitration and I'd also point to the Federal Arbitration

15   Act and the Second Circuit precedent that supports

16   enforcing arbitration provisions where the parties have

17   mutually agreed to submit their dispute to arbitration.

18          Certainly federal law would weigh in favor of

19   enforcing the mutual agreement to submit those disputes to

20   arbitration not withstanding the fact that there may not

21   be an employment agreement or a contract for a set period

22   of time of employment.

23          And I think the key here is that there is a

24   mutuality of obligation here in the language that the

25   defendant and the plaintiff have agreed at the inception

1    of the employment relationship to submit all disputes to

2    arbitration, and I don't see any reason why a court should

3    not enforce that agreement, particularly where the FAA and

4    Second Circuit precedent would support enforcement of that

5    from a public policy standpoint.

6            THE COURT:  Well, I recognize that courts have

7    held that mutual promises to arbitrate are sufficient

8    consideration to support an enforceable agreement.  That's

9    the law in our district, but this raises a further problem

10   for you that you have yet to reckon with and that is the

11   plaintiff's reliance on SCA's reservation, the right to

12   change its policies at any time which, in the plaintiff's

13   view, makes any promise to arbitrate illusory and thus the

14   alleged agreement to arbitrate unenforceable.

15           Why is that not persuasive?

16           MR. GREENE:  Well, my position on that would be,

17   Your Honor, that there's no evidence or proof or assertion

18   that there was any change in policy.  Now, if the

19   defendant had then taken some action unilaterally to

20   change some aspect of the policy or attempt to disclaim

21   their own obligation to arbitrate any disputes, then I

22   guess I might agree with that proposition, but to look at

23   it in a vacuum and say, well, because they may have been

24   able to change the policy, that would invalidate a clear

25   agreement of the parties to mutually submit any disputes

```
 1   to arbitration.  I don't believe that that carries water.
 2           Certainly, if there had been some change or some
 3   alteration of material language, that language would have
 4   to be material to this issue of arbitration, then I would
 5   agree with The Court, but where there's no evidence or
 6   even an allegation of that, then I don't believe that that
 7   argument should invalidate a clear agreement by the
 8   parties to submit disputes such as this to arbitration.
 9           THE COURT:  Well, I guess if you can find a case
10   that says that, it seems to me that if you have an
11   agreement to arbitrate but at the very same time the
12   employer says, by the way, you know, nothing we say is
13   contractually binding in any case, we can change the
14   policy on arbitration anytime we want, how that can be
15   construed as forming a binding contract supported by
16   mutual promises is, in my mind, a problem for you.
17           I don't know that you test the enforceability or
18   un-enforceability of an alleged contract in light of the
19   employer's subsequent conduct in exercising or not
20   exercising its purported right to change, break the rules,
21   so to speak, anytime it pleases.  If you did binding or
22   not, from the moment it's entered into, I believe, if
23   you're talking about basics of contract law in
24   Connecticut.
25           If there is no enforceable agreement to arbitrate
```

1   then yet that have devoted to the effect of the FAA to no

2   avail, but if you want to go ahead and address those

3   beyond what you've given me in writing, Mr. Greene, I'll

4   give you a chance to do that.

5           MR. GREENE:  Yes, Your Honor.  So with respect to

6   the plaintiff's contention that the Ending Forced

7   Arbitration Act should be applied retroactively to the

8   claims that have clearly arisen and accrued before the

9   effective date of the act, I would, one, again point to

10  the clear congressional intent in the EFAA that the ban on

11  arbitration provision should not be applied retroactively

12  and I think that that is the most clear aspect of the

13  statute in terms of its applicability, that it is not to

14  be applied retroactively.  And in light of that, I think

15  The Court should weigh that considerably and err on the

16  side of caution in terms of how that ban is applied.

17          And there's no question that this claim arose and

18  accrued, quite frankly, before the effective date of the

19  act.

20          The fact that there may be other parts of the

21  claim that also accrued after the act or after the

22  effective date of the act should not mean that the statute

23  banning arbitration provisions should be applied

24  retroactively to the entire case.  In fact, my argument

25  would be that if the case accrued at various points, then

1    we should at look at the first date of accrual and that

2    would govern in terms of looking at when the effective

3    date would apply to either ban or not ban the arbitration

4    provision.

5         And my argument, Your Honor, is set forth in my

6    reply brief dated June 23, 2023, on Pages 6 through 12,

7    focuses on what that term "arises" or "accrues" means in

8    the context of this act.  And I pointed to the cases that,

9    talk about that, that the plain meaning of that term has

10   to be applied.  And I've cited the definitions of "arises"

11   and the definitions of "accrues" which the -- from plain

12   meaning standpoint means when they first come into

13   existence or when they begin.

14        Plaintiff has chosen to tack on the Title VII

15   definition of accrues, and I've pointed to the cases that

16   say that the term of art, like the use of accrues in the

17   Title VII context, should not be applied unless there is a

18   specific intent shown by Congress and the legislation that

19   that is the definition they intended, but this is not a

20   statute of limitations provision.  In fact, it's a

21   provision regarding the applicability and retroactivity of

22   the act and my argument would be that based on the cannons

23   of statutory interpretation, the plain meaning of the term

24   "accrues" should be applied and not the term of art from

25   Title VII.

1          I recognize, Your Honor, standard that the other

2    district court decisions have been finding contrary to the

3    *Olivieri v. Stifel* case -- I'm sorry, have been finding

4    consistently with the *Olivieri v. Stifel* case and contrary

5    to the argument that I've set forth in my reply brief.

6          I would note that other than *Olivieri*, the cases

7    that are cited by the plaintiff that have adopted *Olivieri*

8    really haven't gotten into the analysis of and really

9    haven't addressed the statutory cannons of the terms of

10   art -- cannons of statutory interpretation argument that

11   I've set forth in my reply brief.

12         My understanding is that *Olivieri v. Stifel* is on

13   appeal.  I took a look the other day as well as this

14   morning.  I haven't seen any decision on that issue yet.

15         But, in short, Your Honor, I would ask The Court

16   to adopt the reasoning that I've set forth in my reply

17   brief in terms of the interpretation of the term "accrues"

18   to give it its plain meaning and not the statute of

19   limitations meaning under Title VII that the plaintiff has

20   urged.

21         THE COURT:  Okay.  I checked and it appears that

22   the *Olivieri* appeal is being submitted by the Second

23   Circuit panel as of April 3rd, and -- a few months ago --

24   and I gather that there will be no oral argument instead

25   we can simply expect to receive a decision at some point.

1          Turning to the motion to dismiss the constructive

2    discharge claim.  Is there anything you'd like to add to

3    your papers?

4          MR. GREENE:  Give me one moment, Your Honor.

5          (Pause)

6          MR. GREENE:  I think the key, Your Honor, on that

7    argument is the fact that the plaintiff in the amended

8    complaint, recognizing that they're basically taking a

9    second bite at the apple in terms of attempting to plead

10   that constructive discharge claim, has not alleged any

11   facts that would suggest intentional and deliberate

12   creation of intolerable working conditions by the

13   defendant.

14          And I would also focus on the gap between what

15   appears to be the most significant allegation of

16   deliberate conduct which is the communication with the

17   Human Resources person in January of 2022 which I would

18   again note is before the effective date of the EFAA, and

19   then the plaintiff's resignation four months later.

20          I believe that the lack of temporal proximity

21   between that alleged communication, which even if you look

22   at the allegations of the complaint as it is a relatively

23   innocuous discussion, and the temporal -- the lack of

24   temporal proximity between that discussion and that

25   resignation four months later I believe defeats, from a

1    pleading standpoint, defeats the constructive discharge

2    claim.

3              But other point, Your Honor --

4              (Pause)

5              MR. GREENE:  My other point, Your Honor, I would

6    just make reference to the cases that I've cited on

7    Pages 22 and 23 of my memorandum of law dated May 8, 2023,

8    which talk about the fact that the plaintiff must plead

9    facts to show, in a constructive discharge context, the

10   plaintiff must show that the employer's actions were

11   deliberate and intentional in terms of creating a hostile

12   work environment that would lead to a constructive

13   discharge and not merely negligent and ineffective.

14             And it would seem from the allegations made by

15   the plaintiff that they're essentially saying, well, you

16   didn't properly address this situation but they don't rise

17   to the level of intentional and deliberate creation of

18   hostile work environment that would lead to a constructive

19   discharge.

20             And on that basis, Your Honor, we would ask that

21   the motion to dismiss Counts Three and Four be granted.

22             THE COURT:  All right.  Thank you.

23             Ms. Houlding, you're welcome to proceed.

24             MS. HOULDING:  Thank you, Your Honor.

25             I would just like to briefly start out with the

1    issue of the contract and plaintiff agrees with The Court,

2    at least in terms of what I'm perceiving The Court's

3    interpretation of the case law and the arguments here that

4    there is no agreement to arbitrate for several reasons.

5            In brief, I want to just point out the *Morgan v.*

6    *Sundance* case which is the Supreme Court case that

7    reiterates that arbitration contracts are not more favored

8    than any other contract.  So, to the extent that defendant

9    is arguing that there's, you know, the court for favoring

10   of arbitration agreements, the Supreme Court has clarified

11   that they're really on equal footing with any other

12   contract.

13           Here, they're -- the language in the employment

14   handbook reserving for SCA the right to change the

15   handbook at any time, it does make this alleged agreement

16   illusory, so there is no contract at all to be enforced.

17   And the defendant essentially concedes that there's no

18   contract but is essentially attempting to sort of excise

19   the arbitration language out.

20           As The Court noted, SCA has repeatedly, I think

21   at least three times, stated that there is no contract,

22   there are no legal obligations of any type, it's not a

23   legal document, and it's not contractural in nature.

24           The language in the handbook and the

25   acknowledgment are not limited to sort of saying there's

1    no contract of employment for a term, it's really covering

2    the entire handbook itself and making very clear that

3    there are no legal obligations of any kind.

4         I would also point out that the arbitration

5    language itself is not necessarily mutual because it is

6    that in the event that confidentiality agreement, and I'm

7    paraphrasing, does not contain an arbitration provision,

8    which I'll note is the case here, there is no

9    confidentiality agreement then you, meaning employee,

10   nevertheless agree to arbitrate, et cetera.

11        So, even that language puts the onus only on the

12   employee and not on the employer, but the language is very

13   clear that there's no contract.

14        I would also just briefly note that the *Paltz*

15   case, in fact, none of the cases that the defendants cite

16   are on point and don't address the issue at all of

17   whether, you know, you can segregate out an arbitration

18   agreement or arbitration language and does nothing for the

19   defendant's argument.

20        The *Paltz* case was looking at whether the

21   plaintiff opted out of an arbitration agreement, which she

22   could have, stated there were mutual promises and

23   therefore consideration, it wasn't substantively

24   unconscionable and it wasn't procedurally unconscionable.

25   So I'll just point out that case doesn't address what the

1    defendant is attempting to argue here.

2         And similarly the *Johnson v. Raymours* case held

3    that the parties had intended to arbitrate the question of

4    arbitrability and so the court granted the motion to

5    compel arbitration.

6         So the defendant didn't cite any case in support

7    of finding that there is an enforceable agreement here and

8    didn't distinguish any of plaintiff's cases finding that

9    there would be no agreement to arbitrate.

10        So that's where we stand on the question of

11   whether there's a contract to arbitrate here.  I think

12   it's a very straightforward decision to find that there is

13   no agreement here.

14        If The Court doesn't have any questions about

15   that I'll briefly touch on the EFAA and the motion to

16   dismiss the constructive discharge claim.

17        THE COURT:  Okay.  Thank you.

18        MS. HOULDING:  Okay.  So we have -- I won't go

19   through the cases that we've cited in both our moving

20   paper -- I'm sorry, our opposition papers or in our

21   supplemental brief, but I will briefly note that all of

22   the federal cases that have addressed the specific

23   question of when a claim accrues or arises under the EFAA

24   has found in our favor, essentially, that there is no case

25   that we have found that adopts SCA's interpretation of

1   when a claim arises or accrues.

2        I will say even the, I believe it was the

3   *Sullivan* -- that case didn't even address, really, the

4   issue that's at issue here.  It didn't discuss when a

5   hostile work environment arises and it did stay the

6   litigation of claims that happened essentially after the

7   effective date of the End Force Arbitration Act, so it

8   essentially sort of said we'll put on pause the claims

9   that occurred after March 2022 and it never really

10  considered whether there was a continuing violation, as we

11  are arguing here, that there's a continuing violation and

12  so all of the claims should proceed in court including

13  retaliation and constructive discharge claim.

14       I will just point out in terms of the arguments

15  that defendant is making in reply, that from plaintiff's

16  perspective, it should and could of made, kind of, in its

17  moving papers.  There aren't any cases discussing sort of

18  this issue of when does a hostile work environment accrue

19  or arise for purposes of this act.

20       I will say that I think defendant's argument is

21  trying to read in additional language into the statute

22  because the court did not say, I'm sorry, Congress did not

23  say that the act applies to disputes or claims that first

24  arise or first accrue on or after the enactment of the act

25  and so I will just mention that the Congress has been well

1    aware that case law, including Supreme Court case law, has

2    interpreted, for statute of limitation purposes, that a

3    hostile work environment can continue over a long period

4    of time and arises or accrues, essentially, sort of on the

5    last date that something occurred that comprises the

6    hostile work environment.

7              And then, just briefly, with respect to the

8    constructive discharge claim.  So there is no requirement

9    that an employee quit the moment that he or she feels an

10   environment is intolerable.  So the argument that SCA is

11   making, in particular with respect to sort of the comment

12   by Human Resources in January of 2022 that Mr. Dragon

13   essentially had to make a decision which was to continue

14   to be subject to hostile work environment or leave SCA.

15   It's not really relevant that that occurred a couple of

16   months before he did finally leave his employment.

17             The fact of the matter is the complaint alleges

18   that the hostile work environment continued throughout his

19   employment, that his harasser continued to do things that

20   comprise the hostile work environment, staring at him in

21   the clean room, coming in while he was changing, and

22   things of that nature -- laughing at him, talking about

23   him to other people in another language.

24             And that during the period between, for example,

25   January of 2022 and May 2022 when he finally did resign,

1    he became aware that somebody else had been experiencing

2    harassment by the same person and that nothing was being

3    done about it and that was in May, so that was, you know,

4    very close in time to when he actually decided to leave

5    his employment.  We allege that the SCA issued a

6    retaliatory litigation hold that also contributed to the

7    hostile work environment.

8          So there's no requirement that, you know, he quit

9    the moment something bad happens and he is allowed to find

10   a new job or, you know, continue to try to put up with the

11   environment and finally determine that he can't.

12         The deliberateness that Mr. Greene is referring

13   to, there's no requirement that SCA has deliberately tried

14   to make him quit.  The fact of the matter is

15   deliberateness and the intent arises from the creation of

16   a hostile work environment that SCA is well aware of and

17   repeatedly refused to address and, in fact, made worse in

18   various ways by refusing to accommodate him, putting him

19   on a, you know, work performance improvement plan for

20   missing days, not addressing other people's experience and

21   issuing a retaliatory litigation hold.  So, we feel that

22   the constructive discharge claim should not be dismissed.

23         And I will just finally note that the defendant

24   is certainly trying to take advantage of the litigation

25   process in asking This Court to dismiss the constructive

1    discharge claim while simultaneously asking The Court to

2    stay the matter and put the claim in arbitration which is

3    inconsistent from plaintiff's perspective, Your Honor.

4         With that, thank you, very much, Your Honor, for

5    the time and listening to our argument.  If you don't have

6    any questions, we would request that the motion be denied

7    in full.

8         THE COURT:  All right.  Let me follow-up with you

9    with regard to the constructive discharge claim.

10        Our focus at the moment is on the question

11   whether accepting the allegations as true and viewing them

12   in the light most favorable to the plaintiff they support

13   a reasonable finding that the employer deliberately failed

14   to take steps to stop the harassment in circumstances

15   where, objectively, the harassment was so severe that a

16   person in the plaintiff's shoes could be expected to

17   resign involuntarily.

18        In that regard, you cite among other cases, case

19   of *Benitez v. Jarvis Airfoil, Inc*.  In that case, a motion

20   for summary judgment on a constructive discharge claim was

21   denied because looking at the totality of the

22   circumstances, a jury could find that the employer's

23   refusal to undertake protective measures, in light of the

24   complaint of harassment, amounted to a deliberate effort

25   to compel the plaintiff's resignation.  Why?  Because a

1  person in the plaintiff's shoes could reasonably fear

2  violent retribution which, you know, rendered the

3  conditions of the plaintiff's employment so difficult that

4  a reasonable person would have felt compelled to resign.

5          With that case in mind, what allegations do we

6  have here that would permit a reasonable finding that a

7  refusal to undertake protective measures amounted to a

8  deliberate effort to compel the plaintiff's resignation?

9          MS. HOULDING:  Sure.  I'll certainly answer that,

10  Your Honor, because I think that there are plenty of

11  allegations here that would support that.

12          I will just point out that I believe that *Green*

13  *v. Brennan* Supreme Court case makes clear that there's not

14  a requirement to show that the employer deliberately made

15  the conditions, you know, essentially hoping that the

16  employee would resign because that's, essentially, akin to

17  almost like an actual termination.

18          But I will say here, the context is very

19  important because in December 2020, the harasser

20  threatened to kill Mr. Dragon if he told anybody about

21  their encounter and that is the background to all of the

22  harassment that happened after that.

23          So Mr. Dragon reported to Human Resources in July

24  of 2021 about the ongoing harassment, including the threat

25  to kill him.  SCA made it very clear that it was not going

1    to take action to protect Mr. Dragon, that Mr. Dragon had

2    to transfer his position in order to avoid the harasser.

3              The harassment continued after that.

4              He made another report in September of 2021.

5    Again, SCA didn't take action to ensure that he would be

6    safe or protected from his harasser.

7              It's particularly, I guess, severe here where

8    Mr. Dragon is changing clothes in a changing room to get

9    into his protective gear, so he's particularly vulnerable

10   to being watched by his harasser, which he continues to

11   do.

12             He makes another report in November 2021, again,

13   no action.

14             Shortly after that Mr. Dufort in HR is telling

15   him he has to make a decision, essentially, if he wants to

16   be protected from the harassment and that continues again

17   after another report in February 2022.

18             The staring at him in the clean room while he's

19   changing continued throughout the remainder of his

20   employment.  So, even though we don't think that the

21   standard is so high that the employer deliberately wanted

22   to make him quit, I think we actually meet that standard

23   because the violent address, the multiple reports, the

24   continued refusal to take sufficient action to protect him

25   even when he's in this vulnerable state including, you

1    know, changing in the changing room and not being allowed

2    to change in a bathroom, for example, where he had more

3    privacy.  So we do believe that the allegations show that

4    SCA's conduct was deliberate.

5           THE COURT:  With regard to the allegation that

6    the plaintiff learned about the harassment of the

7    co-worker and at the same time learned that nothing was

8    being done about it, what do you allege the plaintiff was

9    told by the co-worker?

10          MS. HOULDING:  I'm just going to pull up the

11   allegation.

12          The Court can give me one moment in terms of what

13   he was specifically told.

14          He was told -- according to the complaint, he was

15   told that in May of 2022 one of the co-workers shared that

16   this alleged harasser had recently sexually harassed a

17   co-worker as well.  What was reported to him was that it

18   was similar in nature to what the plaintiff was enduring

19   and had, what plaintiff had repeatedly reported to SCA

20   including predatory sexual behavior that started online

21   and continued and intensified at SCA including threatening

22   behavior.

23          So, I will say I'm not -- it's not clear to me

24   from the complaint and I don't have a specific

25   recollection at this very moment whether he was told that

1    this other person had reported it to SCA, but that it was

2    clear to the plaintiff that SCA was not choosing -- was

3    choosing not to take any action to protect its employees

4    from abuse and, in fact, we did allege that the plaintiff

5    was told that someone else had reported to SCA -- SCA,

6    even before he began working there, that F.M., which is

7    how we're referring to the harasser, had harassed somebody

8    else and that SCA was aware of it before plaintiff even

9    began.

10          So, this totality of the circumstances shows

11   that, you know, SCA had many reasons to be aware of this

12   person's behavior.  It occurred in front of a team leader

13   who actually expressed his own anger at the plaintiff for

14   reporting the harassment and called him an unfortunate

15   name and even admitted that.

16          So this environment of essentially allowing and

17   supporting F.M.'s harassment of plaintiff and others,

18   particularly where there were known threats involved,

19   threats of physical violence that were extremely serious,

20   and that the behavior and the harassment essentially

21   continued throughout the entire time that the plaintiff

22   was working there demonstrates that it was deliberate.

23          And I'll just mention again the litigation hold

24   that SCA received -- I'm sorry, that SCA issued

25   specifically identified plaintiff's performance,

1    specifically told people not to speak to plaintiff and by

2    implication his counsel about the allegations or about

3    their experience at SCA.  So all of that demonstrates that

4    everything SCA was doing was deliberate.

5          THE COURT:  All right.  Mr. Greene, I'll give you

6    the last word.

7          MR. GREENE:  Yes, Your Honor, on the constructive

8    discharge claim, there's no allegation in Paragraphs 110

9    and 111 that this unidentified employee had reported the

10   alleged harassment to SCA or SCA's Human Resources.

11         I also don't see any reference in the complaint

12   to any allegation that harassment by FM was reported to HR

13   other than by plaintiff.

14         Again, Your Honor, *Terry v. Ashcroft* requires

15   allegations that an employer, quote, intentionally created

16   a work atmosphere so intolerable that he is forced to quit

17   voluntarily.  And I believe that we've demonstrated, Your

18   Honor, that the allegations of this complaint do not

19   sufficiently allege intentional and deliberate conduct.

20   In fact, throughout the complaint there's references to

21   language about, quote, failing to take certain action, but

22   no allegations of deliberate and intentional conduct by

23   SCA.

24         The other point I wanted to make, Your Honor, is

25   that in terms of the applicability of the Ending Forced

1    Arbitration Act, I think it is significant that the

2    language of the statute in terms of its applicability and

3    non-retroactivity doesn't only use the term "accrues" but

4    also uses the term "arises".  And that term "arises" is

5    not a term of art in Title VII sexual harassment law.  And

6    given the term "arises" its plain meaning would, to me,

7    reflect that Congress intended "arises" and "accrues" to

8    mean when it first began.

9            And I've quoted the legal definition or, I'm

10   sorry, definitions, plain meaning definition of the term

11   "arises" and I think that that's why our argument in the

12   reply brief really demonstrates that that the *Olivieri v.*

13   *Stifel* analysis is incorrect and I would be curious to see

14   what the Second Circuit does with it in it sounds like a

15   month or two.

16           Finally, Your Honor, in terms of the initial

17   argument on *Paltz*, I believe that the cases that we've

18   cited do stand for the proposition that where the parties

19   have mutually agreed to arbitrate their disputes that that

20   agreement should be enforced and the fact that there may

21   be language in other parts of the agreement that say that

22   policies can change does not mean that that agreement

23   should be invalidated, particularly where there's no

24   evidence or even an allegation that there were any changes

25   to the agreed-upon arbitration dispute provision.

```
 1                THE COURT:  All right.  Thank you.

 2           I appreciate the work that has gone into your

 3      briefing and your presentations today.

 4           I believe that the plaintiff has the better of

 5      the argument.  I think that the documents offered by SCA

 6      are insufficient to establish the existence of the

 7      enforceable agreement to arbitrate.

 8                This case is distinguishable from the cases cited

 9      by SCA in this regard.  We have SCA disclaiming any

10      contractural obligation of any type in the very same

11      document that it relies on to support its claim of an

12      enforceable agreement to arbitrate.

13           In the absence of any suggestion that the

14      arbitration provision is carved out of that unequivocal

15      disclaimer, I don't see how one could find that there was

16      in fact a mutual commitment to arbitrate as required to

17      provide the necessary consideration for an enforceable

18      agreement under state law.

19           In addition, we have SCA specifically stating

20      that it can, in essence, refuse to arbitrate if it pleases

21      and for that reason as well, I don't see how SCA can

22      sustain its burden.  At a minimum, one would have to

23      conclude that these documents are ambiguous with regard to

24      the enforceability of an arbitration agreement and that

25      ambiguity would need to be resolved against SCA.
```

1          So, I'm satisfied, after considering your

2    submissions, that this is one of those cases where the

3    employer can't have it both ways and on that basis the

4    motion to compel arbitration is denied.

5          I don't need to reach the question of how the

6    EFAA yet applies here and anything I might say on that

7    point is -- (background noise) and it does seem like the

8    Second Circuit is going to be making a decision on this

9    question in the not too distant future and so anything

10   that I might say would be provisional in any of that.

11         I will say that I have looked at the briefs on

12   the appeal in the Olivieri case and I think that the

13   plaintiff's brief, the appellee's brief provides any

14   reasonably detailed response to the arguments that have

15   been made here by SCA and they might -- (background noise)

16         COURT REPORTER:  Excuse me, Judge.  This is

17   Alicia.

18         THE COURT:  -- of the Court of Appeals.

19         COURT REPORTER:  Excuse me, Judge.  This is the

20   Court Reporter.

21         THE COURT:  Yes?

22         COURT REPORTER:  There's some background noise

23   and I'm having difficulty hearing you.  It sounds like a

24   clicking.  I'm sorry.

25         THE COURT:  Somebody might be typing.  It's not

1  me.

2       If somebody else on the line was typing, please

3  do it more quietly or not at all.

4       MR. GREENE:  Sorry, Your Honor.  That was me I

5  was trying to type The Court's ruling and I tend to be a

6  hard typer, but I just muted myself.

7       THE COURT:  Okay.  Thank you.

8       MR. GREENE:  I apologize to the Court and the

9  Court Reporter.

10       THE COURT:  Not at all.

11       Turning to the motion to dismiss the constructive

12  discharge claim.

13       I think that claim is adequately pleaded to

14  survive the motion to dismiss.  The allegations, if

15  accepted as true and viewed most favorably to the

16  plaintiff, support a reasonable inference that the

17  employer failed to take protective measures in

18  circumstances where the plaintiff was likely to quit.

19       The allegations that were reiterated just now by

20  Ms. Houlding, taken collectively and viewed most favorably

21  to the plaintiff are, in my view, at least marginally

22  sufficient.  And while I think that the defendant's motion

23  is not without force, the plaintiff better addressed, at

24  the summary judgment stage, you know, in terms of its

25  legal sufficiency.  At that point, I will have a record

1    concerning the totality of the circumstances that I do not

2    have now.  It may be that at that point I would have to

3    conclude that the plaintiff cannot meet the difficult

4    burden that any plaintiff faces on a claim for

5    constructive discharge, but I think the claim should be

6    allowed to survive the motion to dismiss and so, that's

7    how I see it.

8         If the constructive discharge claim were the only

9    claim in the case, I might feel an obligation to

10   scrutinize what is in front of me more extensively than I

11   have because in that event, if the claim were deemed

12   insufficiently pleaded that could be the end of the case.

13        But here we have a host of claims which are not

14   the subject of a motion to dismiss.  These claims involve

15   the very same witnesses, the very same factual issues that

16   bear upon the constructive discharge claim and so that

17   discovery is going to have to be done in any event and

18   recognizing that I can provide a surer [sic] footed ruling

19   on the constructive discharge claim following discovery I

20   think is the better part of wisdom you might say to allow

21   this claim to survive at least for now.

22        I should note that it's a ruling I'm not

23   embracing every aspect of the plaintiff's argument in

24   opposition to dismissal of the constructive discharge

25   claim.  In particular, I'm not sure that the litigation

1   hold provides much in the way of support for the claim,

2   but I do think that the allegations do collectively enable

3   the plaintiff to get over the hurdle presented by this

4   motion to dismiss.

5          Thank you for your submissions.

6          Is there anything else that we need to do now?

7          Ms. Houlding?

8          MS. HOULDING:  Thank you, Your Honor.  From

9   plaintiff's perspective, just given The Court's ruling,

10  the parties have submitted a Rule 26(f) Report.  At this

11  point I don't recall whether we submitted specific dates.

12  I think they were essentially contingent on the outcome of

13  this motion in terms of the time requested for discovery,

14  et cetera, but I would only just flag for The Court's

15  consideration that that Rule 26(f) Report has been filed

16  and we, you know, request a scheduling order be entered.

17         THE COURT:  All right.  Mr. Greene?

18         (Pause)

19         MS. HOULDING:  He may have to unmute.

20         (Beeping sounds)

21         THE COURT:  I guess we lost Mr. Greene.

22         (Pause)

23         MS. HOULDING:  I wonder if he's still muted

24  himself.

25         (Pause)

```
 1            THE COURT:  Mr. Greene, are you there?

 2            (Pause)

 3            THE COURT:  All right.  I gather we've lost him.

 4   So, Ms. Houlding, what I would like you to do is give him

 5   a call, let him know that we adjourned and with regard to

 6   your 26(f) Report that's, I think, too old for me to rely

 7   on now so I think the two of you should caucus about what

 8   the plan should be going forward and submit an amended

 9   report and if you could do that within the next couple of

10   weeks that would be good.

11            MS. HOULDING:  Certainly, Your Honor.  I will

12   call Mr. Greene right now.  Thank you very much.

13            THE COURT:  Thank you.  Thank you.  Goodbye.

14            MS. HOULDING:  Okay.  All right.

15            (The telephonic conference ended at 10:58 a.m.)

16            (* * * * *)

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3

4

5              I, Alicia A. Cayode Kyles, RMR, Official Court

6    Reporter for the United States District Court for the

7    District of Connecticut, do hereby certify that the

8    foregoing pages are a true and accurate transcription of

9    my shorthand notes taken in the aforementioned matter to

10   the best of my skill and ability.

11

12

13

14

15

16

17

18

19   /s/_____

20   ALICIA A. CAYODE KYLES, RMR
     Official Court Reporter
21   United States District Court
     450 Main Street, Room 320
22   Hartford, Connecticut 06103
     (860) 509-8743
23

24   Dated:  10/1/24

25